UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**United States of America**,

    Plaintiff,

v.

**Jamel Danzy**,

    Defendant.

**No. 1:21-cr-491**

Judge Robert W. Gettleman

## Defense Response to Government's Sentencing Memorandum

**1.**     **USSG § 2K2.1(b)(6)(B) does not apply to this case**

The Government contends that Mr. Danzy's offense level should be increased under USSG § 2K2.1(b)(6)(B). This provision adds four levels if the defendant "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or had reason to believe that it would be used or possessed in connection with another felony offense". USSG § 2K2.1(b)(6)(B). Application Note 14(C) to Guideline § 2K2.1 clarifies that "another felony offense" means "any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained."

The Government's position relies on two cases that are factually and legally inapposite. To review, in *United States v. Jones*, 528 Fed. App'x 627 (7th Cir. 2013), the Seventh Circuit upheld a section 2K2.1(b)(6)(B) enhancement for a defendant who was convicted of possession of a firearm by a felon under 18 U.S.C. § 922(g). "The basis for applying this guideline to Jones was that he transferred

the gun with reason to believe that the informant, by accepting it, would himself commit the crime of possession of a firearm by a felon." *Id.* at 631. *Jones* agreed with the Fifth Circuit's analysis in *United States v. Juarez*, 626 F.3d 246, 255 (5th Cir. 2010), which held that "'another felony offense' excludes 'only the possession or trafficking offense that serves as the basis for the defendant's conviction.'" *Id.* (quoting *Juarez*).

*Jones* was an unpublished opinion, but the Seventh Circuit formally adopted its reasoning in *United States v. Jackson*, 741 F.3d 861, 864 (7th Cir. 2014). Like *Jones*, the defendant in *Jackson* was convicted of possession of a firearm by a felon under 18 U.S.C. § 922(g). The Seventh Circuit upheld a section 2K2.1(b)(6)(B) enhancement for the same reasons it articulated in *Jones*.

Here is the distinction: unlike the defendants in *Jones* and *Jackson*, Mr. Danzy was not convicted of possession of a firearm by a felon. He was instead convicted of conspiracy to violate other subsections of section 922:

1. 18 U.S.C. § 922(a)(5) — transferring a firearm to someone defendant knew or had reasonable cause to believe was not a resident of the State in which defendant resided;

2. 18 U.S.C. § 922(a)(6) — false statement in connection with the acquisition of a firearm and ammunition from a licensed dealer;

3. 18 U.S.C. § 922(d)(1) — selling or otherwise disposing of a firearm and ammunition to a person while knowing or having reasonable cause to believe that person was a felon.

[30] (plea agreement), ¶ 6.

The most important of these for the purpose of the section 2K2.1(b)(6)(B) enhancement is section 922(d)(1). This subsection relates to a point the Seventh Circuit made in *Jackson*. The defendant argued, among other things, that

> his transfer of the firearm to Dircks was not "another felony offense" separate and distinct from his possession offense, and that therefore the https://plus.lexis.com/document/midlinetitle/?pdmfid=1530671&crid=4489ed58-5193-443f-80ba-5dd02f086804&docfullpath=%2Fshared%2Fdocument%2Fcases%2Furn%3AcontentItem%3A5BF5-8F91-F04K-R1D4-00000-00&componentid=6391&prid=c2004158-7eaf-446b-ab93-38b1a0f17f67&ecomp=9y7g&earg=sr1enhancement should not apply to him. Jackson contends that his conduct "was simply the firearms possession or trafficking offense and not another felony." Jackson Brief at 11. He appears to assume that the transfer to Dircks involved no element beyond the offense of conviction, *i.e.*, that his offense of conviction includes the transfer as well as the possession.

*Jackson*, 741 F.3d at 863. The Seventh Circuit rejected this argument out of hand, reasoning that "section 922(g)(1) requires proof of possession only; the transfer of the firearm was a separate act *neither necessary to nor subsumed with* his conviction for possession." *Id.* at 863 (Emphasis added.) Note the emphasized language, which will become significant shortly.

The defendant argued further that,

> had he been charged with not only his possession of the gun under section 922(g), but also the transfer of the pistol to Dircks under 18 U.S.C. § 922(d) (making it a crime to transfer a firearm or ammunition to, *inter alia*, known felons or illegal drug users), the two charges would have been grouped at sentencing and treated as a single offense when calculating his offense level, and as a result of the grouping there would not be "another felony offense" to trigger the enhancement.

*Id.* at 864. The court rejected this argument as well, in a lengthy but important analysis:

> Were the possession and transfer offenses governed by different Chapter 2 guidelines, the court would determine the offense level for each offense separately and then apply the higher of the two levels to the group. The section 2K2.1(b)(6)(B) enhancement would apply to the possession offense, as we have discussed, and if that rendered the offense level for the possession offense higher than the level for the transfer offense, the offense level for the possession offense would become the offense level for the group.
>
> Here, both offenses are governed by the same guideline. But if the court were to follow the same approach, the enhancement would apply to the possession offense *even if it would not apply to the transfer offense*, as Jackson

assumes; the resulting offense level for the possession offense, assuming it was the greater of the two, would then carry the day for the group. So we reasoned in *Mahalick*, where the defendant had been convicted of both possession and transfer offenses and contended that the other felony offense enhancement amounted to double counting because it punished the same behavior as his section 922(d) conviction for the transfer of the gun. This is essentially the same argument that Jackson is making—that as to the transfer conviction, there would be no "other" felony offense to trigger the enhancement. Even if he is right, there would be another offense vis-à-vis the possession conviction, and if the offense level for that conviction alone turned out to be greater than the offense level for the transfer conviction alone, the former should logically apply to the two offenses grouped together.

Consider it from a second perspective. Given Jackson's prior conviction for a crime of violence, section 2K2.1(a)(4) specifies a base offense level of 20; and this would be his base offense level regardless of whether he were convicted of possession, transfer, or both. That particular offense level, however, turns on the defendant's criminal history alone; *it does not take into account, as for example section 2K2.1(a)(6) does, whether the defendant may have transferred the gun to another person whose own possession of the gun amounts to a crime. So the enhancement specified by section 2K2.1(b)(6)(B) would capture an aspect of Jackson's conduct that his base offense level does not.*

If we were to agree with Jackson that a second conviction for transfer of the gun would take the section 2K2.1(b)(6)(B) enhancement off the table, then we would be saying that the Guidelines would, in practice, treat one's unlawful possession and transfer of a firearm to another prohibited person no differently than simple possession of the gun. That would be both illogical and contrary to the spirit of the grouping rules.

*Id.*, at 864-65 (emphasis added) (cleaned up).

This passage should make clear the essence of the problem here. The section 2k2.1(b)(6)(B) enhancement was appropriate for the defendants in *Jones* and *Jackson* because their offense of conviction did not involve the transfer of a firearm to a felon. That is, as the 7th Circuit reasoned, "the transfer of the firearm was a separate act *neither necessary to nor subsumed with* his conviction for possession." *Id.* at 863.

Mr. Danzy, in contrast, *was* convicted an offense that necessarily involves the transfer of a firearm to a felon: as the plea agreement states, Mr. Danzy "conspired with Individual A to commit the following offenses … to sell and otherwise dispose of any firearm and ammunition to a person, namely Individual A, knowing and

having reasonable cause to believe that such person had been convicted in any court of a crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 922(d)(1)". [30] (plea agreement), ¶ 6. Unlike the defendant's conviction in *Jackson*, in Mr. Danzy's case the firearm transfer was *not* "a separate act neither necessary to nor subsumed with his offense of conviction." The transfer was instead a necessary element of the offense of conviction.

This point is supported by Mr. Danzy's base offense level. All parties agree that the base level is 14 under USSG § 2K2.1(a)(6), which applies where the defendant "is convicted under 18 U.S.C. § 922(d); or [...] is convicted under 18 U.S.C. § 922(a)(6) or § 924(a)(1)(A) and committed the offense with knowledge, intent, or reason to believe that the offense would result in the *transfer of a firearm or ammunition to a prohibited person*". Note that this guideline is the same one the Seventh Circuit pointed to in *Jackson* as an example where the base offense level already takes into account the same conduct as the section 2K2.1(b)(6)(B) enhancement, which applies if the defendant "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."

All of this is to say that *Jackson* and *Jones* do not support the Government's proposition. Had Mr. Danzy been convicted of possession of a firearm by a felon, then those cases would be apposite and would support applying a section 2k2.1(b)(6)(B) enhancement. But because he was *not* convicted of such an offense, and was instead convicted of an offense that consists of the same offense conduct the enhancement is meant to account for, it does not apply here. Applying the enhancement on these facts would amount to double counting.

The Court should therefore reject the Government's request to apply a four-level enhancement under section 2K2.1(b)(6)(B). The final offense level should therefore be 14.

### 2. Applying the Government's proposed 10-level increase to determine the sentence would be reversible error

In arguing aggravation based on seriousness of the offense, the Government proposes an upward departure of 10 levels from the guidelines range, which would result in a range of 57–71 months. *See* [38] (Gov. Memo), at 13. But using this type of departure analysis to arrive at the final sentence would be clear error.

The Seventh Circuit discussed the propriety of this method at length in *United States v. Settles*, 43 F.4th 801 (7th Cir. 2022). In that case, the district court used a "mathematical check and balance" in determining the sentence, under which the court "attribut[ed] to each section 3553(a) factor a certain number of offense levels and mov[ed] up the Sentencing Table accordingly." *Id.* at 805. The Seventh Circuit's discussion is worth quoting in full here:

> It may have drawn this approach from *United States v. Jones*, where we pointed out that there are two ways to gauge the magnitude of a district court's deviation from the guidelines: "(1) calculate the percentage deviation from the top of the Guidelines range to the ultimate sentence; or (2) increase the number of offense levels until arriving at an appropriate Guidelines range." 962 F.3d 956, 962 (7th Cir. 2020); see *United States v. Ballard*, 950 F.3d 434, 437-38 (7th Cir. 2020) (same). The magnitude of deviation is important because, as we just noted, district courts have the obligation to ensure that their "justification is sufficiently compelling to support the degree of the variance." See *Gall*, 552 U.S. at 50. That said, once the case reaches the court of appeals, the sentence is reviewed first for procedural regularity and then only for substantive reasonableness. *Id.* at 51. And because the Sentencing Table's ranges cover ever-greater numbers of months, translating a deviation into its offense-level equivalent can help contextualize just how far a district court strayed from the guidelines.
>
> But counting offense levels *after* a sentence is reached *to confirm* its reasonableness, as we suggested in *Jones*, is different from stacking enhancements and their attending offense levels *to arrive* at the sentence. The latter approach is flawed because, by definition, the district court is using

DEFENSE RESPONSE TO GOVERNMENT'S SENTENCING MEMO

enhancements that do not formally apply. In addition, it comes dangerously close to formal departure analysis, by tempting district courts to expand the applicability of enhancements and to stray from the more holistic analysis required by section 3553(a). We do not mean to criticize the practice of taking guidance from policy statements when comparing a defendant's conduct to other possible instances of the offense. See *United States v. Pankow*, 884 F.3d 785, 793 (7th Cir. 2018); *United States v. Brown*, 732 F.3d 781, 786 (7th Cir. 2013). But that guidance must be assessed alongside the other section 3553(a) factors, rather than treated as a sufficient explanation by itself.

With this in mind, we are troubled by certain aspects of the district court's approach. It first mentions the 70-87 month range and the ultimate sentence of 87 months at the very end of what it called its "mathematical check and balance" process. This is concerning because it suggests that the "mathematical" process was not a retrospective "check."

If this were all we had, we would seriously consider a remand. But it is not. When all was said and done, the court also delivered an oral statement and filed a post-sentencing memorandum, each of which describes why 87 months was "right and reasonable" in light of "all the factors under 3553(a)." Those explanations reassure us that the court reviewed the case and ultimate sentence as an integrated whole, rather than deriving the sentence from an incorrect guidelines range. Our concerns are further allayed by the fact that the court tailored the guidance given in U.S.S.G. §§ 3C1.2 and 5K2.6 to the particular facts. It recognized that Settles's flight did not warrant a two-level enhancement, as is suggested by section 3C1.2, but thought that it still merited the equivalent of one level. The court was thus not mechanically following enhancements in a paint-by-numbers manner. Though district courts should be cautious when using similar "metrical checks" in the future, in this case any error that may have existed was harmless.

*Id.* at 805-06 (emphasis in original).

In short, the Seventh Circuit approved of the district court considering the magnitude of the deviation from the guidelines, but cautioned that this should be only a post-sentence check to confirm the reasonableness of the pronounced sentence, not a pre-pronouncement method of arriving at the final sentence. The latter is what the Government proposes here, and *Settles* unambiguously disapproves of that method.

**3.  An above-guidelines sentence of 60 months cannot be supported by USSG §§ 5K2.1 or 5K2.2**

*Settles* does approve of considering the magnitude of the guidelines departure to determine whether the proposed sentence is reasonable. *Id.* The Seventh Circuit explained, "The magnitude of deviation is important because, as we just noted, district courts have the obligation to ensure that their 'justification is sufficiently compelling to support the degree of the variance.'" *Id.* at 805 (quoting *Gall*, 552 U.S. at 50). The Government asks the Court to sentence Mr. Danzy to 60 months in prison. This is not only the statutory *maximum*, but it is also more than double the high end of the guidelines range proposed by the Government (18–24 months), and nearly four times the high end of the guidelines range proposed by the Probation Office and the defense.

The core problem with the Government's justification for a 60-month sentence is that it depends almost exclusively on sentences imposed in other straw-purchase cases that resulted in homicides committed by third parties. *See* Gov. Memo, at 8–13. While the Court should and is required by section 3553(a) to consider sentences for similarly situated defendants, "An above-guidelines sentence is more likely to be reasonable if it is based on factors 'sufficiently particularized to the individual circumstances of the case' rather than factors 'common to offenders with like crimes.'" *United States v. Jackson*, 547 F.3d 786, 792–93 (7th Cir. 2008). Cases in which the Seventh Circuit has found an above-guidelines sentence to be reasonable all involve justifications that were not based on the seriousness of the crime itself, as the Government argues for here.

For example, in *United States v. Wade*, 890 F.3d 629, 633 (7th Cir. 2018),

> the reasons the judge gave for varying upward were not just Wade's recidivism and the nature of the images he possessed; rather, it was that Wade had squandered the chance Judge Gilbert gave him by reoffending. When Judge Gilbert gave his reasons for the sentence at the hearing, he invoked the

adage, "fool me once, shame on you; fool me twice, shame on me," and spoke about the "two breaks" he had previously given Wade. The judge underscored this in his Statement of Reasons form when he wrote, "Leniency provided for previous federal conviction." This reason was "particular" to Wade, and the judge could, in his discretion, vary upward because of it.

Similarly, in *United States v. Steele*, No. 21-2740, 2022 U.S. App. LEXIS 22396, at

*8 (7th Cir. Aug. 12, 2022):

> Steele's decision to brandish guns in the YouTube videos while on bond heightened concerns that he might commit future gun-related crimes, warranting a longer sentence to achieve adequate deterrence.... The judge's deterrence analysis, like the rest of his explanation of Steele's sentence, was based on factors "particularized to the individual circumstances of the case" considering what the videos indicated about Steele's inclination to commit additional gun crimes.

And in *United States v. Ingram*, 40 F.4th 791, 796 (7th Cir. 2022), which was a

felon-in-possession case:

> The judge did more, though, than note that Ingram's conduct was dangerous in some stock sense. Just reaching for a gun while fleeing is sufficient to trigger § 3C1.2. *United States v. Easter*, 553 F.3d 519, 524 (7th Cir. 2009). Here Ingram attempted to retrieve the gun after being Tased and as officers closed in. The reasonable inference is that Ingram desperately wanted to shoot the officers or at least threaten to do so in order to escape. This extreme conduct occurred after an unfortunately lengthy string of prior convictions and arrests, many involving drugs or firearms. The "conjunction" (as the judge put it) of Ingram's dangerous conduct during his arrest and his criminal history revealed an especially great disrespect for the law and demonstrated a heightened need to protect the public from Ingram and deter him and others. *See* § 3553(a).

> The judge's analysis hewed closely to the facts of Ingram's case in particular. The analysis was also logical; as we have explained, firearm possession by a felon who exhibits particularly lawless behavior generally warrants a lengthier sentence than a "run-of-the-mill" § 922(g)(1) offender. *United States v. Ballard*, 12 F.4th 734, 744-45 (7th Cir. 2021). The result was a substantively reasonable sentence.

This leads to the secondary flaw in the Government's argument. The

Government cites USSG § 5K2.1 to support its proposed above-guidelines

sentence. This policy statement, along with its companion provision USSG §

DEFENSE RESPONSE TO GOVERNMENT'S SENTENCING MEMO

5K2.2, authorizes an above-guidelines sentence if death or serious bodily injury resulted from the offense of conviction. While there is no dispute that the firearm Mr. Danzy purchased for Eric Morgan was eventually used by Morgan's brother to kill Officer French and seriously wound Officer Yanez, that fact is not enough by itself to invoke sections 5K2.1 and 5K2.2. The Seventh Circuit held in *United States v. White*, 979 F.2d 539, 545 (7th Cir. 1992), that section 5K2.1 departures must "be supported by findings that death was *intentionally or knowingly risked*. By setting forth this standard, the Sentencing Commission indicated that such departures are appropriate only when the defendant *is actually aware* that a fatal outcome is likely." (Emphasis added.)

The Government's argument on this point (Gov. Memo, at 14) is thus contrary to clear Seventh Circuit precedent. But there is more. The Government knows the Seventh Circuit's position—or at the very least *should* know—because two of the three cases it cites in support expressly mention *White* and the circuit split on this issue. The Sixth Circuit stated in *United States v. Robinson*, 732 F. App'x 405, 409 (6th Cir. 2018), "Following the lead of several (but not all) of our sister circuits, Taylor argues § 5K2.1's 'death resulted' enhancement required the district court to find Brewer's death was either 'intended' or 'knowingly risked.' *See, e.g., United States v. White*, 979 F.2d 539, 544-45 (7th Cir. 1992)." The Fourth Circuit said the same in *United States v. Bayles*, 1993 U.S. App. LEXIS 2877, at *8 n.1 (4th Cir. 1993): "The Seventh Circuit expressly adopted the *Rivalta* standard in *United States v. White*, 979 F.2d 539 (7th Cir. 1992): 'We follow the Second Circuit in requiring that sec. 5K2.1 departures be supported by findings that death was intentionally or knowingly risked. By setting forth this standard, the Sentencing Commission indicated that such departures are appropriate only when the defendant is actually aware that a fatal outcome is likely.'").

DEFENSE RESPONSE TO GOVERNMENT'S SENTENCING MEMO

In any event, the standard that applies in *this* circuit has not been met here. There is no evidence in the record that Mr. Danzy was actually aware that the firearm he bought for Morgan would be used by a third party to kill anyone, much less a police officer. The Government contends that "Danzy knowingly risked death or serious injury by giving a deadly, semi-automatic handgun to someone he knew to be a dangerous felon." Gov. Memo, at 13. But that is a serious overstatement of Morgan's criminal history, even assuming that Mr. Danzy knew all of it. During his interview with ATF agents on August 8, 2021, when asked about his knowledge of Morgan's prior conviction, Mr. Danzy stated:

> lose," and he hoped he would not get arrested "for something I didn't do." DANZY continued speaking with Agents about MORGAN and believed MORGAN was on some type of parole and had to see a parole officer. DANZY stated, "My mind is telling me it's for a gun. I think that he mentioned that to me one time… I think he got busted with a gun up there [Wisconsin]. I think I remember him telling me that." DANZY also thought that MORGAN served some prison time for that case but not know for how long. DANZY recalled that MORGAN told him that a gun was found in MORGANs grandma's house, and MORGAN got charged with it.

ATF ROI (8/8/2021 interview of Jamel Danzy), ¶ 21. ATF agents obtained further details about the prior conviction from Morgan:

> S/A Koslowski then asked MORGAN about his felony conviction case he had in Wisconsin. According to MORGAN, he was selling weed to "some kids:" and told them he had some around the corner, but MORGAN took the weed and ran. Several hours later, the police came to his house and found a gun hidden there and charged MORGAN with it.  MORGAN stated he received probation on this case.

ATF ROI (8/9/2021 interview of Eric Morgan), ¶ 8. This is hardly the picture of Morgan that the Government paints as a "dangerous" felon, and there is certainly no reason based on this information to find that Mr. Danzy "knowingly risked death or serious bodily injury" by giving the firearm to Morgan.

Compare these facts to those in the cases the Government cites. *See* Gov. Memo, at 9–11. In *United States v. Lawson*, No. 2:18-cr-00060, USA Sentencing Memo [34], at 3 (S.D. Ohio Oct. 9, 2018), the defendant gave a firearm to his childhood friend, who *did* have a history of violence:

DEFENSE RESPONSE TO GOVERNMENT'S SENTENCING MEMO

> Smith was prohibited from having that gun due to a prior
> felony conviction for burglary (with a firearm specification) and a prior misdemeanor conviction
> for domestic violence. *See* 18 U.S.C. § 922(g)(1) & (g)(9). Both convictions stemmed from the
> same incident in 2008. During that incident, Smith, who had been fighting with his then-wife,
> barged into a neighbor's residence, found his wife hiding there, placed a loaded .40 caliber
> handgun to her head, and began screaming at her—making her fear for her life.

The evidence showed that the defendant had direct knowledge of these facts because he had used his position as a file clerk in the county prosecutor's office to access his friend's case file on at least four occasions to learn the details about his criminal history. *See id.* at 4.

Similarly, in *United States v. Nguyen*, 622 Fed. App'x 89, 90 (2d Cir. 2015), the Second Circuit noted that the upward departure based on section 5K2.1 was well supported by the record:

> The district court had sound reasons to deviate upward from the Sentencing Guidelines range. Nguyen (i) knew that Spengler had previously been convicted of killing his grandmother with a hammer, (ii) knew that Spengler had voiced an intent to kill his sister, (iii) believed Spengler man purchaser for Spengler. [*sic*] Thus, Nguyen's conduct falls well outside the heartland of straw man purchase cases.

*Id.* at 91.

*United States v. Kitchen*, 87 Fed. App'x 244 (3d Cir. 2004), presents a slightly different factual scenario but nonetheless does not support the Government's position in this case. The district court in *United States v. Collins*, 2010 U.S. Dist. LEXIS 1723 (E.D. Wis. Jan. 11, 2010), examined *Kitchen* in a similar straw-purchase case and thoroughly explained why *Kitchen* did not support the Government's request to sentence the defendant to the statutory maximum of 10 years:

> The government also relied on *United States v. Kitchen,* 87 Fed. Appx. 244 (3d Cir. 2004), where the appellate court upheld an upward departure based on the use of a gun, transferred by the defendant, in a road-rage shooting thirteen months later. That case did not fully support the government's request, for two reasons.
>
> First, the district court in *Kitchen* imposed a modest 2-level departure; it did not leap to the statutory maximum. The court of appeals noted with approval the district court's decision to limit the extent of the departure based on the defendant's "attenuated role" in the shooting victim's injuries. *Id.* at 248. Here, to the extent that defendant bore blame for Burton's shooting of the officers, his role too was attenuated. As discussed, the record contained no evidence that defendant knew, intended or had any reason to believe that Burton would use the gun in the manner he did.
>
> Second, and relatedly, the district court in *Kitchen* first imposed the 4-level guideline enhancement under § 2K2.1(b)(6) based on the defendant's illegal re-sale of 19 guns, including to known drug dealers. The court of appeals noted that this enhancement reinforced its conclusion that the defendant was aware of the risk of injury he created. *Id.* at 247 n.5. I declined to impose that enhancement in the present case.

*Id.* at *24–25 (reformatted for readability). The Government is presumably aware of *Collins'* criticism of *Kitchen*, given that it cited *Collins* in its memorandum. *See* Gov. Memo, at 17.

In sum, none of the three cases cited by the Government support its recommended above-guidelines 60-month sentence based on sections 5K2.2 or 5K2.1 on the facts of this case. Unlike *Lawson* and *Nguyen*, there is no comparable evidence that Mr. Danzy knew, intended or had any reason to believe that Eric Morgan—much less Morgan's brother—would use the firearm in the manner it was used. Even *Kitchen* only imposed a modest 2-level increase, not the 10-level increase sought by the Government here, and the district court's analysis in *Collins* demonstrates the difference between *Kitchen* and this case. As *Collins* noted, the Third Circuit commented that the district court's decision to impose an enhancement under section 2K2.1(b)(6) based on the defendant's illegal resale of 19 guns, including to known drug dealers, supported its conclusion that the

defendant was aware of the risk of injury he created. But as in *Collins*, there is no similar evidence in this case.

Given the lack of any evidence that Mr. Danzy "intentionally or knowingly risked death or serious bodily injury" by buying the firearm for Morgan, there is no basis for imposing an above-guideline sentence based on the policy statements in USSG §§ 5K2.1 or 5K2.2.

Respectfully Submitted,

/s/ James G. Vanzant
Attorney for Jamel Danzy

Holly N. Blaine
James G. Vanzant
Blaine & Vanzant, LLP
922 Davis Street
Evanston, Illinois 60201
Tel.: (312) 788-7584
E-mail: hnb@blainevanzant.com
E-mail: jgv@blainevanzant.com